UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
ROSEMARY PYE, Regional Director  )
of the First Region of the       )
NATIONAL LABOR RELATIONS BOARD,  )
                                 )
            Petitioner,          )
                                 )
       v.                        )          1:10-CV-11974-PBS
                                 )
THE LONGY SCHOOL OF MUSIC        )
                                 )
            Respondent.          )
_____ )
```

**MEMORANDUM AND ORDER**

January 4, 2010

Saris, U.S.D.J.

**INTRODUCTION**

The petitioner Rosemary Pye, Regional Director of the First
Region of the National Labor Relations Board ("Board") moves for
preliminary relief against the respondent Longy School of Music
("Longy") under § 10(j) of the National Labor Relations Act, 29
U.S.C. § 160(j). A non-evidentiary hearing was held on November
29, 2010, and the parties submitted affidavits and exhibits. The

Court **ALLOWS** the Petition in part and **DENIES** it in part [Docket No. 1].

## LIKELY FACTS

Based on the record, the Court finds that the Board has proven that the following facts are likely true.

**A.** **Longy and its Vision for the Future**

Founded in 1915, Longy is a private, non-profit school of music located in Cambridge, Massachusetts. (Pet. Ex. 3, p. 2.) It has produced a number of accomplished alumni, employs an expert faculty, and has a stated mission of "preparing musicians to make a difference in the world." (Zorn Aff. ¶ 8.) The School is divided into two major divisions, a Conservatory, which grants undergraduate and graduate degrees and certificates, and a Community Programs (CP) Division, which serves local children in a "preparatory" program and adults in the "continuing studies" program. (Pet. Ex. 3, p. 2.) There are about 900 students enrolled in the CP Division and about 200 students in the Conservatory. (Pet. Ex. 3, p. 2.) In the 2009-2010 school year there were 165 faculty members actively teaching at Longy. (Id.)

In February 2007, Longy hired Karen Zorn ("Zorn") as its President. In order "to best serve [Longy's] students' needs and solidify [its] stature in the music community," Zorn initiated a comprehensive review of Longy's structure, faculty composition and curriculum. (Zorn Aff. ¶ 10.) In March 2008, she began

working with an ensemble of faculty, students, staff, and trustees, to compose a strategic plan for Longy's future. (Id. ¶ 12.) In January 2009, she presented the final draft of the plan – titled "Strategic Plan: a Compass for Longy's Future, 2009-2012" – to Longy's board (Id. ¶ 16; Jesse Aff. ¶ 5.) The plan identified four strategic goals: "1. Longy is a vibrant player in our local community and global music scene; 2. Longy's programs are visionary and pragmatic, offering a nurturing yet challenging experience for students; 3. Longy has a balanced and sustainable budget; and 4. Longy has the space it needs for its programs to flourish." (Zorn Aff., Tab A.) Of particular relevance to this dispute were the identified objectives of ensuring that school "faculties are structured and compensated in ways that better serve our students" and "seek[ing] the optimal academic partner" for Longy's undergraduate program. (Zorn Aff. ¶ 17.)

During this same time period, Zorn and other Longy executives became apprehensive about Longy's financial situation. They voiced these concerns to Longy's board, and in December 2008 the board authorized its Executive Committee to explore the possibilities of either working to ensure Longy's long-term viability on its own or being acquired by another academic institution. (Id. ¶¶ 21-23.)

Although there is some dispute over the concreteness of Longy's plans to layoff faculty by the time the Union was certified in early 2010, there is no question that internal

discussions about faculty restructuring began to crescendo in the months following the December 2008 board meeting. Beginning in 2009, Zorn began meeting with senior staff about the possibility of faculty restructuring. On March 4, 2009, the Director of the CP Division, Miriam Eckelhoefer, submitted a report to senior staff on the proposed restructuring. (Eckelhoefer Aff. ¶ 10; Eckelhoefer Aff., Tab B.) The report's executive summary urged the school to "reduc[e] the number of faculty teaching under 5 hours/week and phas[e] out high paid faculty or allow[] them to continue by self-filling their studios." (Eckelhoefer Aff. ¶ 11; Eckelhoefer Aff., Tab B.) By March 9, 2009, Zorn had developed a general set of criteria for paring down faculty that focused on "1. Ability to recruit; 2. Years of service; 3. Overall positive contribution to the school; 4. Needs of each program; [and] 5. Balancing expense and overhead across the departments." (Zorn Aff., Tab D.) Senior staff continued to meet during the summer, and by October 2009 administrators had developed a list of the categories of changes they would be making for each faculty member. (Ratzlaff Aff. ¶ 10.) According to Zorn, discussions were "necessarily suspended" by the time the Union filed its election petition in October 2009, because the administration needed to "focus on the Union election and running the school." (Zorn Aff. ¶ 45; see also Pet. Ex. 6, Attach. A (Zorn's email to faculty explained that between September 2009 and February 2010, "much of our attention [was] focused on the union election.").)

During this period, Longy's board considered a number of long-term strategic changes, including faculty restructuring. At an April 14, 2009 board meeting, where the board considered the possibility of merging with Lesley University in Cambridge, Massachusetts, Zorn presented a turnaround plan that included "decreasing the number and creating a core faculty for which Longy is their primary place of employment." (Id. ¶ 23; Def. Tab B.) The Lesley merger ultimately stalled, but faculty changes were further discussed at board meetings on May 5, 2009, and September 12, 2009, and Longy continued to seek partners for a merger. According to Zorn, the thrust of these discussions was that Longy did not have enough of a core faculty and that too many people were only peripherally involved with the school. (Zorn Aff. ¶¶ 27-28.) Although many of the details of the restructuring still had to be figured out, particularly the criteria that would be used for determining which faculty would be let-go or reassigned, Zorn identified March 15, 2010, as the proposed date for implementing faculty restructuring, because March 15 was historically the date on which Longy informed its faculty members of their statuses for the following year. (Id. ¶ 29; Jesse Aff. ¶ 10.) At the September 12, 2009 retreat the board approved both a "turnaround strategy" and a "merger concept." (Zorn Aff. ¶ 30.) Zorn interpreted this approval as her "'walking papers' to implement faculty realignment." (Id. ¶ 31.)

Simultaneously, Bard College in Upstate New York emerged as a likely merger partner. In October 2009, a group from Longy visited Bard, (Id. ¶ 33,) and on February 22, 2010, the Board reviewed the first draft of a Letter of Intent between the two institutions. (Id. ¶ 35.) Since May 2010, Bard and Longy have been in active negotiations about the merger, but the details of these negotiations are subject to a confidentiality agreement and are not present in the record. (Id. ¶¶ 39-40.) The relationship between the merger and the faculty restructuring is unclear; Zorn indicates that the increasing likelihood of a merger by early 2010 intensified the immediate need to "implement the Strategic Plan," (Id. ¶ 45,) but the faculty realignment does not seem to be a precondition for the merger.

**B.    Election of a Collective Bargaining Representative and Implementation of Faculty Realignment**

While these possibilities were under consideration by Longy administrators, Longy faculty debated whether to certify an exclusive collective bargaining representative. On October 28, 2009, the American Federal of Teachers filed an election petition with the Board.  On February 1, 2010, the Union received certification to represent a bargaining unit made up of "[a]ll faculty currently teaching, and who have a weekly average of at least three benefit units in one of the last two fiscal years, excluding all other employees, visiting faculty, administrators, confidential employees, office clerical employees, managers,

guards and supervisors as defined in the Act."[1] (Pet. Ex. 4.)  At the time, this group included about 88 faculty members. (Pet. Ex. 5 at p. 1, ln. 16.)

After the Union's certification, plans for faculty realignment began to solidify.  In January 2010, Longy administrators resumed regular meetings to map out the changes the School planned to implement leading up to the Bard merger. Zorn describes these final meetings as "dotting the i's and crossing the t's" on plans that had already been established,(Zorn Aff. ¶ 47,) whereas petitioner sees them as part of an accelerated effort to concretize otherwise general concepts about future changes right as union strength was beginning to burgeon. By February 15, 2010, just over two weeks after the union was certified, administrators reached "preliminary agree[ment]" on the final makeup of the restructuring. (Id. ¶ 48.)  Three faculty would be granted emeritus status; 34 faculty would not have their contracts renewed; ten faculty would be assigned to CP programs only; and 37 faculty would be assigned to Conservatory only. (Id. ¶ 48.) The School would also restructure its departmental chair organization.  The fourteen Conservatory departments and chairs would be consolidated into seven or eight departments/chair positions, and all nine CP chairs would be eliminated and

---

[1]     It is not entirely clear what a "benefit unit" is, but the scope of the bargaining unit is not at issue in this case.

replaced with an "Associate Director of Community Programs" and a "Chair of Chamber Music and Small Ensembles." (<u>Id.</u> ¶ 49.) Decisions about which faculty would be terminated or transferred were to be based on faculty members' private teaching hours and the specific program needs of the Conservatory and CP divisions. (<u>Id.</u> ¶ 51; Chin Aff. ¶ 26.) Importantly, the final criteria for these determinations did not mirror the criteria set out in the March 2009 Eckelhoefer report. Specifically, the threshold number of private teaching hours was reduced from five to three. (Eckelhoefer Aff. ¶ 15.)

On February 12, 2010, before these changes had been announced to faculty, the Union contacted Longy and President Zorn to request negotiations on a collective bargaining agreement. (Pet. Ex. 5, p. 1.) The Union's representative did not hear back from Zorn. (<u>Id.</u>) On February 15, 2010, Longy faculty received an e-mail from Zorn announcing an all-faculty meeting on Friday March 5, 2010. (Pet. Ex. 6., Attach. A.) The email presaged transformative changes that would bring "difficult decisions" and indicated that Zorn would be cancelling morning classes that day so all faculty could attend. (<u>Id.</u>) On February 23, a Union representative again contacted Zorn, this time expressing her concern about the March 5 meeting. (Pet. Ex. 5, p. 2.) The Union offered to meet with Zorn before the meeting, but she refused. (<u>Id.</u>)

At the March 5 meeting with President Zorn, which lasted three hours, Zorn discussed, among other things, the pending merger with Bard, the reorganizing of the Conservatory and CP divisions, phasing out the undergraduate program, expectations for the faculty moving forward, and the faculty realignment changes. (Zorn Aff. ¶ 58.) She laid out the considerations for non-renewal of faculty contracts, which included "[a] continuing pattern of inactivity; performance; [and] curriculum restructuring." (Zorn Aff., Tab B.) She also informed faculty that they would be receiving letters the following week informing them of their teaching assignments for the following year. (<u>Id.</u> ¶ 59.)

This news understandably provoked anxiety among many of the faculty, and the pitch of the meeting grew discordant. The petitioner takes the position that throughout this meeting President Zorn exhibited anti-union animus and attempted to discourage participation in the Union. According to Clayton Hoener, a faculty member and Union President, Zorn repeatedly mentioned that the school was moving away from a "model of democracy." She also allegedly said that the school wanted people to "get on the bus and move forward with us" and that the changes she was announcing were "non-negotiable." (Pet. Ex. 6., p. 4-5.) Hoener also reports that in response to a question about why the Union was not involved in negotiating over the decision, Zorn replied, "This is not business as usual, we still have management

rights. This is outside the normal course of business. We are in a recession. That is why I am making decisions." (Id., p. 5.) Faculty member Jonathan Cohler claims that Zorn said she wanted faculty who were "committed to Longy" and did not use it as a "convenient stopping place for an afternoon." (Pet. Ex. 7, p. 2.) Zorn does not deny any of these statements but says that they were "misconstrued." (Zorn Aff. ¶ 61.) Immediately after the March 5 meeting, the Union held a meeting at a nearby hotel to discuss what had happened. Those in attendance were fearful that they would receive letters of nonrenewal. (Pet. Ex. 5, p. 2.)

On March 8 the Union requested bargaining as soon as possible about the impact of the changes announced on March 5. (Pet. Ex. 5, p. 3.) The Union and Longy met on March 12, around the time when the School was sending out letters to employees about their employment status for the following year. (Id.) Specifically, the Union objected to the fact that they had not received prior notice about the changes and the way in which they were to be implemented. (Id.) Longy, represented by its attorney, responded that the changes affected big picture management issues that also impacted administrative staff and faculty not in the bargaining unit and that a meeting with a subsection of the faculty before the March 5 meeting would have been inappropriate. (Id., p. 4.) It also indicated, however, that the changes would not be implemented until the end of the school year at the

earliest and that Longy still had a duty to bargain over their effects. (Id.)

On March 11 and 12 Longy sent letters to all faculty members regarding their status for the following year.  Eight bargaining unit members were told that their contracts would not be renewed. (Pet. Ex. 6, p. 7.)  Thirty-three were divisionally reassigned, meaning that they could no longer teach in either the Conservatory or CP divisions. (Id.)  One was reassigned to a different department in the Conservatory and told she could no longer teach the French Horn. (Pet. Ex. 16.)  The five CP Chairs/Coordinators were relieved of their duties as these positions were dissolved. (Pet. Ex. 7, p. 6.) Longy sent these notifications directly to employees, and did not distribute them to the Union.  (Pet. Ex. 5, p. 5-6.)  Each letter invited individual employees to contact the administration if they had concerns about their new assignments. (Pet. Ex. 7, Ex. A.)

Also at issue in this case are changes Longy made to employee health benefits.  As in previous years, in the spring of 2010, Longy evaluated the overall value of the plans provided by its insurance carrier, Harvard Pilgrim. (Ratzlaff Aff. ¶ 25.) Longy Chief of Staff, Kalen Ratzlaff, determined that Longy could provide nearly identical coverage with significant cost savings by switching to Blue Cross/Blue Shield (BCBS)(Ratzlaff Aff. ¶ 25.)  Ratzlaff announced the change in a memorandum to staff in June 2010. (Id. ¶ 27.)  Coverage under BCBS was slightly less

generous than under Harvard Pilgrim; deductibles for the family
PPO increased, as did co-pays for emergency room visits and some
prescriptions, and the new plan did not include pediatric well
care. (Pet. Ex. 6, p. 9.) But Longy justified the changes by
arguing that coverage decreases were more than made up for by
substantial decreases in monthly premiums. (Ratzlaff Aff ¶ 28.)
Ratzlaff alleges that the Union never raised the insurance change
at any of the bargaining sessions held in the month of June
during the insurance open enrollment period. (Id. ¶ 29.) The
Union did request information from Longy about the change on June
3 and did not receive it until June 29. (Pet. Ex. 5, p. 7.)  The
Union objected to the unilateral change at a June 29 bargaining
session. (Id.)

      The Board also objects to changes made to the benefits of
Clayton Hoener.  Between 1998 and 2010, Longy had allowed Hoener
and his partner, Lisa Lederer, another Longy employee, to combine
the employer contributions they would each use to pay for an
individual plan in order to purchase a family plan. (Pet. Ex. 6,
p. 9.)  In July 2010, Longy informed Hoener and Lederer that it
would no longer take this approach. (Id.)  According to Ratzlaff,
Longy made the change in order to rectify an inequity between
Hoener and Lederer and the two other faculty families at Longy.
(Ratzlaff Aff. ¶ 31.)  The other faculty members were allowed to
use only one of their employer contributions in order to purchase
a family plan they could both share. (Id.)

## C. **Collective Bargaining**

The Board and Longy paint very different pictures of the course of collective bargaining over the months between announcement of the changes and the issuing of a complaint, though there is a consensus that discord over the March changes has monopolized many of the parties' bargaining sessions.

According to the Board, the Union has consistently asked Longy to rescind the changes in order to bargain over the changes and their effects. Longy has refused but, in response to Union inquiries, it verbally explained the criteria used for determining what would happen with each faculty member. (Pet. Ex. 7, pg. 5.) Though the decisions were based primarily on numerical criteria, they were balanced by various exceptions Longy described as falling under the umbrella of "program need." (Id.)

Simultaneously, the Union has been frustrated by what it has perceived as an unwillingness to come to an accord on an initial collective bargaining agreement. As of November 8, 2010 the parties had met seventeen times (Pet. Ex. 13, p. 5.) During this period the Union submitted a number of proposals but did not received any serious counter-proposals (Id.) Longy insisted that it would not provide a counter-proposal until the Union had a submitted a "complete" proposal. (Id.) The Union argues that it was delayed in submitting a proposal until mid-summer 2010 because it was still awaiting information that it had requested

from the School. (Id.)  Even after submitting complete proposals, the Union did not initially receive counter-proposals aside from two brief correspondences regarding the School's policies regarding discrimination and access to personnel files. (Id.) Longy, through its attorney, stated that it would present a proposal at the October 22nd meeting, but the School allegedly came to that meeting unprepared and left early, this time assuring the Union that it would have a comprehensive counter-proposal to it in November. (Id.)

The Union also argues that Longy's anti-union animus and reticence to bargain collectively have caused the erosion of Union support.  In late April, twenty employees signed a letter of support for President Zorn and criticized the Union. (Pet. Ex. 6, p. 8.)  Additionally, a number of employees have expressed their fear about being retaliated against if they support the union. (Pet. Ex. 8, 6-9.)

Longy sings a different tune on contract negotiations.  It emphasizes that the Union did not provide a complete proposal until August, and claims that the Union has wasted considerable time attempting to negotiate about non-mandatory terms, caucusing, requesting information, and attempting to garner political support. (Ratzlaff Aff. ¶¶ 40-44.)


D.  **Procedural Backdrop**

On October 13, 2010, the NLRB issued a Complaint and Notice of Hearing in this case alleging that Longy violated § 8(a)(1) and § 8(a)(5) of the National Labor Relations Act.

Respondent allegedly violated §§ 8(a)(1) and 8(a)(5) by terminating the employment of eight unit employees; changing job assignments and limited work opportunities of thirty-seven unit employees; changing health insurance carriers, premiums and benefits of all unit employees; and changing the amount of employer contribution to health insurance for two unit employees without first bargaining over these issues.

Respondent allegedly violated § 8(a)(1) by impliedly telling employees that it was futile to have the Union represent them, and impliedly threatening employees with termination or unspecified reprisals if they were not loyal to Longy.

The Petitioner seeks a temporary injunction from this Court ordering Longy to cease and desist from impliedly threatening employees and suggesting that joining the Union is futile, unilaterally changing terms and conditions of employment, and refusing to bargain with the Union.  The petitioner also seeks an order reinstating the eight terminated faculty members, restoring prior work to the 34 reassigned employees, reinstating the titles and duties of the coordinators in the Community Program, and reinstating the health insurance contributions of employees Hoener and Lederer.

## Legal Conclusions

## A.  Standard

The National Labor Relations Act (NLRA), 29 U.S.C. §§ 151-169, protects employees' rights to collectively bargain over the terms and conditions of employment.  In order to mitigate the substantial harm that might be caused by allowing unfair labor practices to be committed while the National Labor Relations Board adjudicates labor disputes, Section 10(j) of the Act gives the Board the authority, after issuing a complaint alleging an unfair labor practice, to petition a United States District Court to provide temporary relief pending a final administrative determination on the merits.  See 29 U.S.C. § 160(j).

In considering whether to grant temporary relief under § 10(j), a district court considers whether there is "reasonable cause" to believe that the respondent has committed an unfair labor practice and whether temporary injunctive relief is "just and proper" under the circumstances.  See Pye v. Sullivan Bros. Printing, Inc., 38 F.3d 58, 63 (1st Cir. 1994); Asseo v. Centro Medico Del Turabo, 900 F.2d 445, 450 (1st Cir. 1990).

In meeting the "reasonable cause to believe" prong the Board must show only that its position "is fairly supported by the evidence." Sullivan Bros., 38 F.3d at 63 (quoting Centro Medico del Turabo, 900 F.2d at 450)(internal quoation marks omitted). The "just and proper" prong presents a higher hurdle. Sullivan Bros., 38 F.3d at 63.  In this Circuit, the court must apply the usual four-part test for determining whether to grant a

preliminary injunction. Id. In order to establish that

preliminary relief is just and proper, the Board must

demonstrate:

> i) A likelihood of success on the merits;
> ii) A potential for irreparable injury in the absence of relief;
> iii) That such injury outweighs any harm preliminary relief would inflict on the defendant;
> iv) That preliminary relief is in the public interest.

Id. (citing cases). In engaging in this analysis, the court must

address the whole "panoply of discretionary issues" that are

raised by a petition for preliminary relief pending a final

determination on the merits. See Maram v. Universidad

Interamericana De Puerto Rico, Inc., 722 F.2d 953, 958 (1st Cir.

1983).

The Board has also moved the Court to decide this matter

based solely on the affidavits and related documents filed by the

parties. The First Circuit has instructed that "the [district]

court's function in reviewing a § 10(j) petition is a limited

one, that of 'determin(ing) . . . whether contested factual

issues could ultimately be resolved by the Board in favor of the

General Counsel,' and as a result, the need for an evidentiary

hearing, as opposed to reliance on affidavits and stipulated

facts, will vary from case to case." Fuchs v. Hood Industries,

Inc., 590 F.2d 395, 397 (1st Cir. 1979) (citations omitted); see

also, Asseo v. Pan Am. Grain Co., 805 F.2d 23, 25 (1st Cir. 1986)

("[A] district court's function in a Section 10(j) case is not to

weigh the credibility of contradictory evidence, and so decide the merits."). The Court does not believe that a hearing with live witnesses would change its analysis of this matter. Moreover, such a hearing would cause delay, undermining the purposes of preliminary relief, and would be duplicative of proceedings before the Administrative Law Judge (ALJ), who will hear this case in January 2011.

**B.    Reasonable Cause**

The Court finds that the likely facts of this case fairly support the Board's position and, thus, that there is reasonable cause to believe that Longy has committed an unfair labor practice.  This finding is supported by the Court's determination that preliminary relief is just and proper and, in particular, the concomitant holding that the Board has established a likelihood of success on the merits.

**C.    Just and Proper**

The Petitioner alleges a number of different unfair labor practices.  Because the Court finds that unilateral changes to the health benefits of all bargaining unit employees and to the employer contributions to the health insurance premiums of two employees did not give rise to irreparable harm, it does not assess those claims for a likelihood of success on the merits.

**i.    Likelihood of Success on the Merits:**

Sections 8(a)(5) and 8(d) of the NLRA, 29 U.S.C. §§
158(a)(5) and (d), require an employer to bargain "in good faith
with respect to wages, hours and other terms and conditions of
employment." See Litton Financial Printing Div. v. N.L.R.B., 591
U.S. 190, 198 (1991). These provisions have been interpreted to
prohibit employers from making unilateral changes to terms or
conditions of employment without first bargaining to impasse with
the employees' collective bargaining representative.  See
N.L.R.B. v. Katz, 369 U.S. 736, 747 (1962).

As a preliminary matter, it is necessary to address Longy's
assertion that faculty restructuring occurred before the Union
was certified and, thus, before Longy was required to bargain.
This would be a much closer case if Longy had already made
specific plans to change employment policies but had yet to
formally announce them before the union election.  By the time
the Union was on the scene, the school had certainly begun to
consider faculty restructuring, but it had yet to settle on the
number of faculty it hoped to terminate and reassign or the
specific criteria it would use for deciding which faculty to
terminate.  In fact, beginning in January 2010, when the Union
was elected, senior staff met weekly in order to consider these
issues.  Although general plans to restructure the faculty began
to form in 2009, the decision to move toward a core faculty
coincided not with reports and presentations to the Board of
Trustees but with the substantive decisions the senior staff made

in 2010.  Even if the School were able to argue that it made a
concrete decision to restructure in 2009, decisions about how
many employees would be reassigned or terminated and what
criteria the School would use in making these determinations were
potentially bargainable issues as decisions in their own right or
as the effects of the prior decision, and the School did not
resolve these issues until after the Union was certified.  The
timing of the Union's emergence, therefore, does not excuse
Longy's alleged failure to bargain.

This does not mean that Longy necessarily had a duty to
bargain over all of its decisions.  Specifically, even if the
Board could establish that the concrete decision to move toward a
core faculty model post-dated the Union's election, Longy would
not owe a duty to bargain over this broad, structural change.  In
First National Maintenance v. NLRB, 452 U.S. 666 (1981), the
Supreme Court held that a company that provided housekeeping and
cleaning services for commercial businesses did not commit an
unfair labor practice by unilaterally cancelling a contract with
a customer without first bargaining with the collective
representative of employees who would be affected by the change.
Id. at 667-68.  The Court described a trio of categories of
management decisions that might affect the terms and conditions
of employment.  First are those decisions like "advertising and
promotion, product type and design, and financing arrangements,
[which] have only an indirect and attenuated impact on the

employment relationship." Id. at 676-77. Management, within its entrepreneurial discretion, has the authority to make these changes without first bargaining with a union. Id. Second are those decisions, "such as the order of succession of layoffs and recalls, production quotas, and work rules, [which] are almost exclusively 'an aspect of the relationship' between employer and employee." Id. at 677. These kinds of decisions are mandatory subjects of bargaining. Finally, there is a third category of decisions, which, though having an impact on the employment relationship, are so fundamental to the business enterprise that they are not mandatory subjects of bargaining as long as "the benefit[] for labor-management relations and the collective-bargaining process, does not outweigh[] the burden placed on the conduct of the business." Id. at 679. "These decision[s], involving a change in the scope and direction of the enterprise, [are] akin to the decision whether to be in business at all 'not in [itself] primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment.'" Id. at 677 (quoting Fibreboard Paper Products v. N.L.R.B., 379 U.S. 203, 223 (1964)(Stewart, J., concurring)).

Because it was made as part of a transformation in the "scope and direction" of the school, Longy's decision to move toward a "core faculty" model falls in First National Maintenance's third category. It is true that the change, even understood at its most general level, explicitly implicated

21

Longy's employment policies, but its _purpose_ was a fundamental shift in the way the school did business. This is not a case where Longy intended to "continue doing the same work with essentially the same technology, but to do it with fewer employees by virtue of giving some of the employees more work assignments." Holmes & Narver, 309 NLRB 146, 146 (1992). The school's efforts to restructure its faculty, even if not a precondition for its other ambitions, were harmonized with its plans to cancel its undergraduate program and merge with another institution. They were, thus, more analogous to a plant manager's decision to begin manufacturing a different product than a decision to subcontract work to a new set of employees in order to reduce labor costs. See A.G. Communications Systems Corp., 350 NLRB 168, 172 (2007)(finding that layoffs are not mandatory subjects of bargaining where they were "motivated by [the employer's] desire to increase profitability by merging duplicative corporate departments, and to secure the opportunity to sell a different type of telephone switching equipment to a new set of customers" as opposed to a desire to "reduce labor costs").

Additionally, the burdens of bargaining over the decision to move to a "core faculty" would outweigh any marginal benefit for employees and the Union. The record suggests that bargaining over this core strategic decision would have been futile. See First Nat. Maintenance Corp., 452 U.S. at 683. Some structural

decisions, in particular those concerning labor costs, benefit from the input of an employees' collective bargaining representative. See Fibreboard Paper Products, 379 U.S. at 213-14 (Labor costs are "peculiarly suited for collective bargaining."). But this decision was not about labor costs; it was a key component in a long-term vision for changing the institution both to ensure financial stability and to better serve its students. Longy faculty would not have had any success dissuading Longy from pursuing the core faculty system.

Moreover, forcing Longy to bargain over its decision would "significantly abridge" its freedom to manage the academic business of the school. See id. at 213. The School considered the faculty restructuring to be essential to its efforts to better serve its students and solidify its position in the musical community.  This freedom must be protected zealously in this case in particular because Longy is an academic institution concerned with the pedagogical impact of its employment policies. Cf. Brown Univ., 342 NLRB 483, 490 (2004)(in finding that graduate student assistants are not employees under the NLRA, noting that many issues in higher education policy "give the appearance of being terms and conditions of employment, [but they] involve individual concerns and decisions, which are based on different, and often individualized considerations").

Despite Longy's prerogative to pursue faculty restructuring, it did have a duty to bargain over the effects of this decision,

and the effects of the decision to restructure may have included

specific changes to the employment contracts of Longy employees.

See First Nat'l Maintenance, 452 U.S. at 681-82; United Food &

Commercial Workers, AFL-CIO v. NLRB, 519 F.3d 490, 495 (D.C. Cir.

2008).  As the First Circuit explained in NLRB v. Pan Am. Grain,

Co., 432 F.3d 69, 71-72 (1st Cir. 2005), vacated on other

grounds, 448 F.3d 465 (1st Cir. 2006),

> In certain situations, a decision to order layoffs
> may be the prerogative of management but an
> obligation may still exist to bargain with the
> union as to "effects" of the layoffs; in other
> words, management may have to bargain about
> whether and to what extent to provide severance to
> the laid-off employees even though it may not have
> to discuss whether to make the layoffs. (Id.)

Generally, effects bargaining concerns issues related to the

manner in which employees will be laid off, like severance,

pensions, and COBRA insurance. See NLRB v. Transmarine Nav.

Corp., 380 F.2d 933, 939 (9th Cir. 1967).  However, in certain

situations, the Board and courts have considered layoffs to be an

"effect" of a "clearly defined" management decision over which an

employer is not required to bargain. See Fast Food Merchandisers,

Inc., 291 NLRB 897, 901 (1988). In these cases the layoffs are

not the "inevitable consequence[s]" of the decision and are,

thus, potentially amenable to union bargaining. See NLRB v.

Litton Fin. Printing Div., 893 F.2d 1128, 1133 (9th Cir. 1990),

rev'd in part on other grounds, 501 U.S. 190 (1991).  But they

are also sufficiently "link[ed]" to the decision such that they

can be considered among its effects, as opposed to a separate stand-alone decision. See Fast Food Merchandisers, Inc., 291 NLRB at 899 (1988).

For example, in Fast Food Merchandisers, Inc., the Board considered whether a company that distributed food to restaurants had violated the NLRA by unilaterally eliminating a shift at one of its distribution centers and as a result terminating three bargaining unit employees. See Fast Food Merchandisers, Inc., 291 NLRB at 899. An ALJ determined that the decision to lay off the employees was a mandatory subject of bargaining. Id. The Board agreed but found that the terminations and the elimination of the shift were "clearly a direct result" of a prior decision to transfer work to a newer distribution center in Jacksonville, Florida. Id. This decision was not a mandatory subject of bargaining and would not have been affected by the union's involvement, but the specific manner in which the decision was implemented, including the shift termination and layoffs, could have been adjusted to better protect the terminated employees. Id. "Some of the employees, for example, might have been offered the right to transfer to other shifts if openings occurred, or the right to transfer to another facility. . . ." Id. The employer, thus, had a duty to bargain over the effects of the decision to open a new plant, and these effects included the shift termination and the firings.

In <u>Kendall College of Art</u>, 288 NLRB 1205 (1988), the Board
held that an employer had <u>not</u> committed an unfair labor practice
by deciding to offer a Bachelor of Fine Arts degree, even though
this decision would require it, by law, to lay off faculty who
did not have advanced degrees in art. <u>Id.</u> at 1209-10.  The Board
went on to hold, however, that the employer was required to give
prior notice and an opportunity to bargain over the effects of
this change.  These effects included not only "how to treat
teaching employees who could not meet the requirements (severance
pay and the like)," but also "whether to allow teaching employees
who had not met the requirements leaves of absence to obtain
advanced degrees, wage changes for those who met the
requirements, money grants for those who were still pursuing
advanced degrees, and assistance to find other jobs." <u>Id.</u> at
1210.  The employer did not have a duty to bargain over the
decision to offer a new degree, even though that change would
very likely result in some terminations, but it did have a duty
to bargain over how this change would be implemented with regard
to affected employees.

Similarly, in this case, Longy had a duty to bargain over
the specific manner through which it would transform to a core
faculty.  At the heart of the employment changes Longy announced
in March 2010, was a decision to move toward a new faculty model
defined by fewer faculty members teaching more hours.  This
decision fell into <u>First National Maintenance</u>'s third category

because it was concerned with the scope and direction of the school and would not have benefitted from bargaining. It would almost certainly result in terminations or reassignments of some kind, but the changes Longy implemented in March were not the inevitable consequences of this strategic decision. Like Kendall College of Art, the School could have terminated different or fewer employees by working with the Union to establish a plan to move toward a new faculty system. For example it could have provided opportunities for increased hours or considered different criteria for terminating employees that took into account the employee's other responsibilities. Cf. Cooper Thermometer Co. v. NLRB, 376 F.2d 684, 688 (2nd Cir. 1967)(affirming a Board finding of an unfair labor practice where employer did not provide employees with information about how they could transfer to a new plant after operations at an initial plant were terminated). Longy should have provided an opportunity to bargain over these possibilities.

In order to meet this obligation Longy had to bargain over the effects of its decision "in a meaningful manner and at a meaningful time." First National Maintenance Corp., 452 U.S. 666, 681-82 (1981). This requirement entailed a duty to provide "timely notice" of its decision to move toward a core faculty, see Metropolitan Teletronics, 279 NLRB 957, 960 (1986), and to bargain in good faith over the effects of that decision. The Board has held that "a party who enters into negotiations with a

pre-determined resolve not to budge from an initial position demonstrates 'an attitude inconsistent with good-faith bargaining.'" <u>TNT Logistics N. Am.</u>, 346 NLRB 1301, 1303 (2006) (quoting <u>General Electric Co.</u>, 150 NLRB 192, 196 (1964), enfd., 418 F.2d 736 (2nd Cir. 1969)).

On the record here, it is substantially likely that the ALJ will find that the School failed to meet this obligation. It announced the decision to perform layoffs and reassignments in an effort to move toward a core faculty on March 5, but by that point it had already established the criteria for determining which employees would be laid off. It never gave the Union the opportunity to bargain over these issues, and it did not even begin bargaining with the union until March 12, <u>after</u> it had already sent many of the letters to employees regarding their 2010-2011 status. Moreover, though it offered to bargain over "effects," it did not make any serious proposal or counterproposal regarding terminated and reassigned employees, and it presented decisions about individual employees as non-negotiable. <u>See</u> <u>TNT Logistics N. Am., Inc.</u>, 346 NLRB at 1303 (finding a failure to bargain in good faith over the effects of a decision to close a site where the employer never discussed what might be acceptable "closing terms" and never made a counterproposal to the union's proposal). In this way, even if

Longy recognized its duty to bargain over effects, it

misunderstood how far this duty stretched.[2]

For the same reason, Longy's argument that the Union waived

its duty to bargain over effects is without merit. "[W]hen an

employer notifies a union of proposed changes in terms and

conditions of employment, it is incumbent upon the union to act

with due diligence in requesting bargaining." NLRB v. Pinkston-

Hollar Const. Services, Inc., 954 F.2d 306, 310 (5th Cir. 1992).

"It is, however, well established that a union cannot be held to

have waived bargaining over a change that is presented to it as a

fait accompli." Gulf States Mfg. Inc. v. NLRB, 704 F.2d 1390,

1397 (5th Cir. 1983). Even though Longy offered to bargain over

the effects of its decision, it never presented any willingness

to bargain over a number of those effects, including the criteria

for restructuring. The Union, thus, could not have waived its

right to bargain over any of these issues.

Longy was entitled to develop a plan to restructure its

faculty without consulting the Union. But it was required to

place a number of other issues on the bargaining table. These

included how it would decide to layoff or reassign faculty; whom

---

[2]     Because Longy did not provide a reasonable opportunity to
bargain over the effects of the decision, the Court need not
address the Board's argument that the rule from Bottom Line
Enterprises, 302 NLRB 373 (1991), required Longy to reach impasse
on bargaining over the entire collective bargaining agreement
before implementing any changes. See id. at 374. Moreover, the
significance of this rule for effects bargaining is unclear.

it would decide to layoff or reassign; whether these faculty would be given a second chance to adjust to the new model; and what would happen with the employees that would be laid-off and reassigned. There is no evidence that the School ever gave the Union an opportunity to bargain over these possibilities.

The Board also alleges that Longy violated § 8(a)(1) of the N.L.R.A., which prohibits employers from "interfer[ing] with, restrain[ing] or coerc[ing] employees" in their right to organize and bargain collectively, by making coercive statements at the March 5 meeting. In particular, the Board alleges that Zorn's statements that "this is not a democracy" and that she wanted people to "get on the bus" were meant to discourage union participation by suggesting that union membership was futile and implying that there would be retaliation for unloyal employees.

It is possible that the Administrative Law Judge (ALJ) hearing this case will find that Longy's actions violated § 8(a)(1). The Board and courts have held that implicit suggestions that union membership is futile and that employers will retaliate against union supporters are "coercive" under the Act. See, e.g., HarperCollins San Francisco v. NLRB, 79 F.3d 1324, 1330 (2nd Cir. 1996)(finding a §8(a)(1) violation where there was evidence of "an implicit threat of repercussions for union loyalty, as opposed to company loyalty"); Altercare of Wadsworth Ctr. For Rehabilitation & Nursing, 355 NLRB No. 96, 2010 WL 329136, at * 17 (2010)(implying that it would be futile

to retain the Union as bargaining representative was unfair labor practice).  But the First Circuit has reminded that "[w]hether an employer's actions are coercive depends on the entire factual context in which the actions occur." <u>3-E Co, Inc. v. NLRB</u>, 26 F.3d 1, 3 (1st Cir. 1994).  The final determination of whether these statements violate § 8(a)(1) will be made after hearing live testimony concerning the context in which they were made. This Court is hesitant to perform its own analysis without having the same opportunity.  The Court would be more likely to pursue this inquiry if there were evidence that such threats were pervasive and ongoing or if they the statements were made recently.  As it stands, there is no evidence that these statements present a problem that needs to be addressed at this stage in the litigation.

### ii.  Irreparable Harm

Now that the Court has decided that the Board has a likelihood of success on the merits of its claim that Longy committed an unfair labor practice, the Court must consider whether the Board meets the remaining prongs of the test to determine whether temporary injunctive relief is just and proper. The Board argues that the harm caused by these alleged unfair labor practices is not capable of redress after adjudication on the merits.  The Court finds this argument unpersuasive in regard to the changes to employee health benefits, but it agrees with

the Board when it comes to Longy's unilateral terminations and reassignments of bargaining unit employees.

The Court does not believe that it is in any better position to repair harm caused by Longy's alleged unilateral changes to employee health benefits than an ALJ will be a few months from now. Even assuming that these actions were unfair labor practices, they were not nearly as disruptive to the collective bargaining process or as potentially detrimental to union support as were the changes announced in March 2010. To the extent that either the changes to all employees' plans or the specific changes to Hoener and Lederer's plans have impacted the course of collective bargaining, these impacts are no more easily addressed now, months after the fact, than they will be after an adjudication on the merits. Moreover the change to BCBS is at least arguably beneficial to some employees. Though this may not affect the inquiry into whether an unfair labor practice has occurred, it does impact the urgency with which the change must be addressed.

The changes announced in March 2010, however, have had a more substantial impact on collective bargaining and a more profound effect on the way employees perceive the Union. The harms caused by these unilateral changes would not be fully redressed by a limited backpay order issued months from now. Even if this would provide some help to the terminated employees, "[w]hen the Board files an application for [10(j) relief] it does

not act on behalf of the individual employees, but in the public interest." <u>Asseo v. Pan Am. Grain Co., Inc.</u>, 805 F.2d 23, 27 (1st Cir. 1986)(quoting <u>Eisenberg v. Wellington Hall Nursing Home, Inc.</u>, 651 F.2d 902, 906 (3d Cir. 1981))(internal quotation marks omitted). The issue here is not just the harm to individual employees but the way that Longy's changes impacted collective bargaining, an especially important consideration because the Union and Longy had yet to negotiate a first collective bargaining agreement. The rule requiring that a union be notified and given an opportunity to bargain over the effects of a large-scale change in business operations before that change is made is grounded in the importance of giving the union an opportunity to bargain over effects when it "retain[s] at least a measure of bargaining power." <u>See</u> <u>Metropolitan Teletronics</u>, 279 NLRB at 959; <u>see also</u>, <u>Katz</u> 369 U.S. at 747 ("Unilateral action. . . of necessity obstruct[s] bargaining."). The next few months will be a critical period for Longy and its employees; the school will simultaneously strive to implement its long-term strategic plan as it negotiates a first collective bargaining agreement with the Union. While the Union represents the interests of Longy faculty during this tumultuous period, it should have all of the advantages it is owed under the law, including the employment of terminated faculty who will be impacted by Longy's plans.

Independent of the harm to the bargaining process, Longy's actions have potentially impacted the Union's standing among Longy faculty. The Board cites a number of examples to argue that Longy's unilateral changes likely compromised the Union's "prestige and legitimacy" among Longy employees. <u>See</u> <u>Morio v. North Am. Soccer League</u>, 632 F.2d 217, 218 (2nd Cir. 1980). This concern is heightened in this case in particular because of the Union's recent election. National labor policy recognizes the precariousness of union support during the first year after its certification. <u>See</u> <u>Brooks v. NLRB</u>, 348 U.S. 96, 104 (1954) (upholding Board rule requiring certification to be honored for a reasonable period, usually one year). Some form of preliminary relief is warranted in order to stave off further erosion of Union support.

In response, Longy points out that the Board's delay in bringing this case undermines its argument that the harm is not capable of repair after the ALJ adjudicates this matter. The alleged unfair labor practices occurred in March, but the Board did not bring its petition until November 2010. In reality, the actual delay is much shorter. After attempting to bargain, the Union contacted the Board with complaints in August 2010. At this point, the Board still had to perform an investigation before it could bring a complaint. The employees should not be "punish[ed]. . . for a delay beyond their control." <u>Muffley ex rel. NLRB v. Spartan Mining Co.</u>, 570 F.3d 534, 544 (4th Cir.

2009).  Even though time has passed since the alleged violations, the delay is not substantial in this context.

### iii. Balance of the Hardships

The Board asks this Court to order Longy to reinstate terminated faculty and return reassigned faculty to their original assignments.  There is no evidence that reinstating part-time faculty will create a financial burden.  Morever, the affidavits cited by Longy for the proposition that injunctive relief will disrupt the Bard merger merely state that the restructuring "fit[s] well with the anticipated merger," (Jesse Aff. ¶ 16,) and that "Longy and Bard College are bound by a confidentiality agreement and the [merger] process is a fluid one." (Zorn Aff. ¶ 40.)  There is no evidence in the record that the relief provided here, particularly because it does not require Longy to once again restructure its faculty, will prevent the School from pursuing its strategic plan or merging with Bard. Nonetheless, Longy has expressed some valid concerns about unscrambling all of the changes it made in March 2010 halfway through a school year.  At this point, students have already been reassigned to new teachers.  For this reason, the Court does not order Longy to return all terminated and reassigned faculty to the teaching assignments they would have had were it not for the realignment.

Instead, the Court orders Longy to reinstate terminated faculty until Longy and the Union bargain to an impasse over the

effects of the decision to restructure the faculty.  The School

is not required to provide any of the terminated teachers with

the specific teaching assignments they had in 2009-2010, nor is

it required to recreate the CP chair position,[3] or remove any

employee from the role he or she has served since the beginning

of this school year.  But, beginning with the issuance of this

order, Longy is required to pay terminated faculty members the

salary they would be receiving had they been retained for 2010-

2011 and to return these employees to the bargaining unit if they

were removed from the unit as a result of any of the changes

announced in March 2010.  This remedy restores the integrity of

the bargaining process while recognizing the hardship that might

face Longy and its students if the school were to adjust its

faculty assignments midway through the school-year.

　　　The remedy also reflects appropriate respect for Longy's

management prerogative in moving toward a core faculty model.  In

Transmarine Navigation Corp., 170 NLRB 389 (1968), where an

employer had closed down a site without bargaining over its

effects on employees, the Board established a "limited backpay

requirement designed to make whole the employees for losses

suffered as a result of the violation and to recreate in some

---

[3]     The Court finds that the burdens of reshuffling CP chair
work back to the bargaining unit outweigh the benefits for the
Union and former chairs.  The analysis might be different if
former CP chairs were removed from the bargaining unit entirely,
but the record is unclear as to whether this occurred.

practicable manner a situation in which the parties' bargaining position is not entirely devoid of economic consequence for the [employer]." Id. at 390; see Pan Am. Grain, Co., Inc., 423 F.3d at 73 (describing the Transmarine remedy as "limited" and not including reinstatement).  In crafting this remedy the Board did not force the employer to undo all of its changes, but the Board did attempt to simulate the bargaining conditions the employer would have faced had it given the union notice and a meaningful opportunity to bargain over effects. Similarly, here the Court does not force Longy to once again makeover its faculty structure by returning terminated faculty to their original teaching assignments, but it does attempt to restore the Union to the bargaining position it would have had if not for Longy's unilateral changes.

### iv. Public Interest

Lastly, for all of the reasons discussed above, some form of interim relief is in the public interest.  Section 10(j) of the N.L.R.A. is designed to protect the collective rights of employees and the integrity of the collective bargaining process while the NLRB adjudicates labor-management disputes.  The Longy School of Music must be free to cultivate itself as an improved institution that better serves its students and the community, but it cannot pursue this transformation without regard to the bargaining rights of its employees.

## ORDER

The Court orders that Longy engage in bargaining over the effects of its decision to restructure the faculty.

The Court also orders Longy to reinstate with pay the eight members of the bargaining unit who were notified of their terminations in March 2010.  The Court denies without prejudice any relief with respect to former CP chairs.

/s/ PATTI B. SARIS
PATTI B. SARIS
UNITED STATES DISTRICT JUDGE
